**REVERSE AND REMAND and Opinion Filed August 10, 2023**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-22-00893-CV

**MATTHEW FULLER AND FULLER WEALTH MANAGEMENT, LLC,
Appellants
V.
CRAIG HAUSZ, MICHELLE HAUSZ, CMH ADVISORS, PLLC, AND
CMH WEALTH MANAGEMENT, LLC, Appellees**

**On Appeal from the 366th Judicial District Court
Collin County, Texas
Trial Court Cause No. 366-01154-2022**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Garcia, and Kennedy
Opinion by Justice Garcia

Appellants sued appellees for breach of contract and defamation. Appellees successfully moved to dismiss the suit under the Texas Citizens Participation Act, and appellants appealed. Concluding that appellees failed to carry their burden under step one of the multi-step TCPA process, we reverse and remand.

### I. BACKGROUND

**A.      Factual Allegations**

Appellants alleged the following facts in their live pleading.

In 2018, appellants and appellees entered an agreement relating to the joint provision of investment advisory services. But disagreements soon arose among the parties, and in April 2020 the parties signed a Confidential Settlement Agreement ("Agreement") to resolve their disagreements. The Agreement contained a mutual confidentiality and non-disparagement clause.

After the parties executed the Agreement, appellant Matthew Fuller applied to become a member at Bent Tree Country Club. Fuller later learned that appellees Craig and Michelle Hausz were "working against [his] interest in violation of the Agreement" and that one or more appellees "openly discussed the disagreements resolved by the Agreement with members of the Club." Additionally, one or more appellees "actively tarnished Mr. Fuller's reputation to other members of the Club, even describing Mr. Fuller as 'blackballed' at the Club." Fuller's application to join the country club was denied.

## B. Procedural History

Appellants sued appellees for breach of the Agreement and for defamation.

Appellees answered and counterclaimed for their attorneys' fees. Later they filed a motion to dismiss under the Texas Citizens Participation Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011. Appellants responded to the dismissal motion.

After a hearing, the trial judge signed an order that granted appellees' TCPA motion, dismissed appellants' claims with prejudice, and awarded appellees their

attorneys' fees. The judge did not state the basis for his ruling. Because the order disposed of all of appellants' claims and effectively granted all the relief appellees sought by their counterclaim, it was a final judgment. *See Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 200 (Tex. 2001) (holding that a judgment is final if it "finally disposes of all remaining parties and claims, based on the record in the case").

Appellants timely appealed.

## II. ISSUES PRESENTED

Appellants raise three issues on appeal, and their third issue has two parts. We paraphrase the issues as follows:

1. Did the trial court err by concluding that appellees satisfied the TCPA's "matter of public concern" requirement at step one of the TCPA analysis?

2. Did the trial court err by concluding that appellants failed to demonstrate that their claims are exempted from the TCPA by § 27.010(a)(5)(B)?

3a. Did the trial court err by concluding that appellants failed to present clear and specific evidence of every element of their claims?

3b. Did the trial court err by concluding that appellees proved an affirmative defense as a matter of law?

## III. ANALYSIS

### A. Overview of the TCPA

The legislature enacted the TCPA both to encourage people to exercise certain constitutional rights, such as the rights of association and free speech, and to protect the right to file meritorious lawsuits for demonstrable injury. *See* CIV. PRAC. & REM.

§ 27.002. To advance these goals, it created a new motion-to-dismiss procedure that is augmented by features such as a discovery stay and a right to recover attorney's fees. *See id*. §§ 27.003(a), 27.003(c), 27.005, 27.009(a)(1).

A TCPA motion to dismiss triggers a multi-step analysis. *See* § 27.005(b)–(d). At step one, the movant bears the initial burden of demonstrating that the nonmovant's legal action is based on or in response to (1) the movant's exercise of the right of free speech, the right to petition, or the right of association, or (2) conduct by the movant fitting the descriptions found in § 27.010(b). *See id*. § 27.005(b).

If the movant carries its step-one burden as to a claim, the burden shifts to the nonmovant to establish by clear and specific evidence a prima facie case for each essential element of that claim. *See id*. § 27.005(c). If the nonmovant does not carry its burden, the claim must be dismissed. *See id*. § 27.005(b), (c). And even if the nonmovant carries its step-two burden, the movant can still win dismissal by establishing an affirmative defense or other grounds on which it is entitled to judgment as a matter of law. *Id*. § 27.005(d).

The nonmovant can avoid the three-step process and defeat a TCPA motion to dismiss by showing that a statutory exemption applies. *See id*. § 27.010(a); *Temple v. Cortez L. Firm, PLLC*, 657 S.W.3d 337, 346 (Tex. App.—Dallas 2022, no pet.) (holding that courts may consider exemptions before addressing the first step of the three-step process).

In determining whether a legal action is subject to or should be dismissed under the TCPA, a court shall consider the pleadings, evidence the court could consider under the summary-judgment rule, and supporting and opposing affidavits stating the facts on which the liability or defense is based. CIV. PRAC. & REM. § 27.006(a); *cf. Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (stating, in connection with step one, that the plaintiff's petition is the best and all-sufficient evidence of the nature of the action). We consider these materials in the light most favorable to the nonmovant. *Temple*, 657 S.W.3d at 342.

We review de novo the trial judge's determination that the parties met or failed to meet their respective burdens under the TCPA. *Garcia v. Semler*, 663 S.W.3d 270, 279 (Tex. App.—Dallas 2022, no pet.).

## B. Issue 1: Did appellees carry their burden at step one of the TCPA analysis?

Appellees successfully argued in their TCPA motion that appellants' claims were based on or in response to appellees' exercises of their right of free speech or their right of association. *See* CIV. PRAC. & REM. § 27.001(2), (3) (defining those rights for TCPA purposes). Appellants argue that the trial judge erred by granting the motion because (1) both of those rights require the movant to have said or done something involving a matter of public concern and (2) none of appellees' acts at issue involve a matter of public concern. We agree with appellants.

1. **Applicable Law**

The TCPA defines the two rights that appellees invoked in their dismissal motion as follows:

> (2) "Exercise of the right of association" means to join together to collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern.
>
> (3) "Exercise of the right of free speech" means a communication made in connection with a matter of public concern.

*Id*. § 27.001(2), (3). Both definitions use the phrase "matter of public concern," and the TCPA further defines that phrase, in relevant part, as follows:

> (7) "Matter of public concern" means a statement or activity regarding:
>
> . . .
>
> (B) a matter of political, social, or other interest to the community; or
>
> (C) a subject of concern to the public.

*Id*. § 27.001(7)(B), (C).

Because the meaning of the phrase "matter of public concern" is pivotal to appellants' first issue, we review its legislative evolution and judicial glosses. The 2019 amendments to the TCPA substantially revised the definition of "matter of public concern." Before those amendments took effect, the TCPA defined the phrase by referring to a list of general topics:

> (7) "Matter of public concern" includes an issue related to:
>
> (A) health or safety;

(B) environmental, economic, or community well-being;

(C) the government;

(D) a public official or public figure; or

(E) a good, product, or service in the marketplace.

Citizens Participation Act, 82nd Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 962 (H.B. 2973) (amended 2019) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)). At first, the Texas Supreme Court read the old definition expansively, holding that a communication related to a matter of public concern even if it had only a tangential relationship to a listed topic. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (per curiam). But it later retreated from this expansive reading. *See McLane Champions, LLC v. Houston Baseball Partners LLC*, No. 21-0641, 2023 WL 4306378, at *6 n.9 (Tex. June 30, 2023) (stating that *ExxonMobil*'s tangential-relationship test had been "cabined" in *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 137 (Tex. 2019)).

The supreme court has not addressed the new definition of "matter of public concern," but we have concluded that the legislature intended to narrow the phrase's scope with the 2019 amendments. *See Vaughn-Riley v. Patterson*, No. 05-20-00236-CV, 2020 WL 7053651, at *3 (Tex. App.—Dallas Dec. 2, 2020, no pet.) (mem. op.). We also concluded that the legislature intended for the courts to construe the new definition consistently with First Amendment jurisprudence, under which

–7–

communications are matter[s] of public concern when they can be fairly considered as relating to any matter of political, social or other concern to the community or when [they address] a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.

*Id*. (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)) (internal quotations omitted).

More recently, we opined that the 2019 amendments both narrowed the scope of "matter of public concern" and repudiated the tangential-relationship test. *Beard v. McGregor Bancshares, Inc.*, No. 05-21-00478-CV, 2022 WL 1076176, at *5 (Tex. App.—Dallas Apr. 11, 2022, pet. denied) (mem. op.); *see also Chesser v. Aucoin*, No. 01-20-00425-CV, 2020 WL 7391711, at *4 (Tex. App.—Houston [1st Dist.] Dec. 17, 2020, no pet.) (mem. op.) (opining that the 2019 definition more strongly emphasizes the "public" component of "matter of public concern"). *But see Kadow v. Grauerholz*, No. 02-20-00044-CV, 2021 WL 733302, at *3 n.6 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.) (concluding that 2019 amendments actually broadened the definition of "matter of public concern"). *See generally* Laura Lee Prather & Robert T. Sherwin, *The Changing Landscape of the Texas Citizens Participation Act*, 52 TEX. TECH L. REV. 163, 167 (2020) (observing that the amended definition "provides a more generalized approach to determining whether something is a matter of public concern"). We further held that private disputes that affect only the fortunes of the litigants are not matters of public concern. *Beard*, 2022 WL 1076176, at *6; *see also McLane Champions*, 2023 WL 4306378,

at \*7 (concluding that the former definition of "matter of public concern" required a communication to "have some relevance to a public audience").

### 2. The Communications or Conduct in Question

Next, we identify the specific communications or conduct that, in appellees' view, constituted exercises of the rights of association and free speech under the 2019 definitions discussed above.

At the outset, we note that appellees denied in their TCPA motion that they made "disparaging statements of any kind." Their denial did not bar them from seeking a TCPA dismissal because at step one the defendant can rely on the plaintiff's pleadings to show the basis for the plaintiff's legal action. *See Hersh*, 526 S.W.3d at 467. Accordingly, we turn first to appellants' petition and then to the relevant evidence. *See* CIV. PRAC. & REM. § 27.006(a) (listing materials a court shall consider when ruling on a TCPA motion).

In their petition, appellants alleged that appellees "work[ed] against Mr. Fuller's interest" when Fuller applied to join the Bent Tree Country Club. Appellants pleaded two specific examples of appellees' misconduct:

> 19.  For example, one or more of [appellees] openly discussed the disagreements resolved by the Agreement with members of the Club. . . .

> 20.  Further, one or more of [appellees] actively tarnished Mr. Fuller's reputation to other members of the Club, even describing Mr. Fuller as "blackballed" at the Club.

Appellants also filed a declaration by Fuller in response to appellees' TCPA motion, but that declaration added few details to the foregoing allegations. Specifically, Fuller said that club member Shelby Ricketts refused to endorse him "because he had heard from Mr. and Mrs. Hausz that we had been involved in a business dispute." Fuller also said that Craig Hausz sent another club member, Michael Bailey, a text message saying that Fuller "was blackballed from the country club."

From the foregoing, we conclude that appellees' alleged communications for step-one purposes were:

1. statements discussing the business disagreements that were resolved by the Agreement;

2. statements (possibly the same ones identified in point 1) that Fuller and the Hauszes had been involved in a business dispute; and

3. a statement by Craig Hausz to another club member that Fuller was blackballed from the country club.

Next we consider whether appellees demonstrated that these communications involved a matter of public concern so as to make them exercises of the rights of free speech or association. *See id*. § 27.005(b).

### 3. Analysis of the Right of Free Speech

The communications were exercises of the right of free speech if appellees made them "in connection with a matter of public concern." *Id*. § 27.001(3). Appellants' argument is straightforward: the alleged communications involved nothing more than private disputes affecting no one but the disputants, so they did

–10–

not involve a matter of public concern and were not exercises of the right of free speech. For the reasons that follow, we agree with appellants.

### a.      Communications About the Parties' Business Dispute

The first two alleged communications identified above amount to statements (1) disclosing that appellants and appellees had been involved in a business dispute and (2) discussing to some unknown extent the disagreements that the Agreement resolved. Appellees bore the burden of demonstrating that these communications involved a matter of public concern. *See id*. §§ 27.001(3), 27.005(b)(1)(A). Appellees argue that they carried their burden, urging that appellants' petition and a cease-and-desist letter they sent to appellees demonstrate that the communications involved matters of "interest to the community." *Id*. § 27.001(7)(B). We discuss the petition and the letter in turn.

First, appellees argue that their alleged statements about the parties' past business disputes involved a matter of public concern because appellants alleged in their petition that these statements created a "rumor mill" that harmed appellants' reputations and abilities to obtain new clients. We disagree with this argument. The petition alleges or at least implies that the communications cast appellants in a negative light, but precedents show that negative comments do not automatically implicate a matter of public concern. For example, we recently held that communications about a bank's poor business practices did not involve a matter of public concern, in part because such matters potentially affected at most only the

bank's investors, customers, and vendors. *Beard*, 2022 WL 1076176, at \*10–11. The same reasoning applies here: even if the business disputes and disagreements revealed in the communications put appellants in a negative light, there is nothing to suggest that the communications would affect anyone but appellants' clients and potential clients. Other authorities also support our conclusion. *See Ojala Partners, LP v. Driesse*, No. 05-22-00009-CV, 2023 WL 1878881, at \*3 (Tex. App.—Dallas Feb. 10, 2023, no pet.) (mem. op.) (communications accusing a former employee of stealing confidential information did not involve a matter of public concern because the communications were "non-specific and . . . of interest only to the parties involved"); *Box v. PetroTel Oman LLC*, No. 05-21-00951-CV, 2022 WL 3151974, at \*4 (Tex. App.—Dallas Aug. 8, 2022, no pet.) (mem. op.) (alleged disclosure of confidential information did not involve a matter of public concern because it affected only the fortunes of the private parties involved).

Second, appellees point to appellants' cease-and-desist letter to the Hauszes in which appellants' attorney said the following:

> Your disparagement and interference has caused at least one member to withhold or withdraw their endorsement of Fuller's membership application and has negatively impacted Fuller's personal and business relationships with other members at the Club. In addition, because your disparaging statements have been directly or indirectly communicated to longtime clients of Fuller's who are closely associated with members of the Club, your actions have damaged his relationship with such clients and within the community.

Appellees argue that this letter shows that appellees' alleged communications had wide-ranging effects and therefore must have involved a matter of public concern.

–12–

Again, we disagree. Taken as a whole, the letter asserts that the Hauszes' "disparagement and interference" damaged Fuller's relationships with country-club members, non-members, and people "within the community." But the letter, viewed in the light most favorable to appellants, does not show that the Hauszes' communications were of interest to the community. Rather, the letter suggests only that the communications were of interest to people—club members or not—who already had relationships with Fuller. Nothing in the record suggests that those people amounted to a community.[1] *See Community*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (1981) (defining "community" as "a body of individuals organized into a unit or manifesting usu. with awareness some unifying trait"); *Community*, THE NEW OXFORD AMERICAN DICTIONARY (2001) (defining "community" as "a group of people having a religion, race, profession, or other particular characteristic in common"). We conclude that individuals united only by the fact that they had relationships with Fuller that were damaged by appellees' alleged communications are not a

---

[1] Appellees argue that § 27.001(7)(B)'s phrase "the community" can refer to a relatively small group of people. For support, they rely on cases construing the phrase "community well-being," which was one of the matters of public concern listed in the pre-2019-amendments version of the TCPA. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 896 (Tex. 2018) ("[A]ny allegation of malfeasance and criminality by the developer and the HOA likely concerns the well-being of the community [i.e., a small residential community] as a whole."); *Patel v. Patel*, No. 14-18-00771-CV, 2020 WL 2120313, at *7 (Tex. App.—Houston [14th Dist.] May 5, 2020, no pet.) (mem. op.) (allegations that member of non-profit organization's board of directors was mentally unfit and stole funds concerned "the well-being of the community the Foundation seeks to serve," which was apparently Indian-Americans). But the people identified in appellants' cease-and-desist letter were not a "community" akin to the residents of a specific neighborhood or persons of a particular national origin.

"community" within the meaning of § 27.001(7)(B). Thus, the cease-and-desist letter does not demonstrate that the alleged communications were of "interest to the community."

Our *Vaughn-Riley* decision supports our conclusion. In that case, a performance of a play in Tyler, Texas, was canceled, and actress Vaughn-Riley commented about that cancellation on the internet. 2020 WL 7053651, at *2. She was sued for her statements, she moved to dismiss under the TCPA, and the trial judge denied her motion. *Id*. at *1. We affirmed that denial, holding that Vaughn-Riley failed to show that her statements about the play's cancellation involved a matter of public concern. *Id*. at *3–4. We observed that although the people associated with the play's production and the people who had paid to see the play were probably concerned about its cancellation, there was no evidence "that the general public, or even the local Tyler creative community and art patrons at large[,] were affected by or concerned with the cancellation of this single performance." *Id*. at *3. Thus, we implicitly concluded that the group of people united only by the fortuity that they had bought tickets to the play did not themselves amount to a "community" within the meaning of § 27.001(7)(B). *See id*. Similarly, in this case the group of people who had relationships with Fuller that were allegedly damaged by appellees' alleged communications do not amount to a "community."

For these reasons, we hold that appellees failed to demonstrate that the alleged statements about the parties' business disputes and disagreements were made in connection with a matter of public concern.

### b.    The Statement that Fuller Was "Blackballed"

Next we consider the alleged statement by Craig Hausz that Fuller was "blackballed" from the country club. "Blackball" means "to prevent from becoming a member of an organization by casting an adverse vote" and "to vote against : make impossible by casting an adverse vote." *Blackball*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY.

Although the rejection of Fuller's membership application was plainly of interest and concern to him, we see nothing in the pleadings or evidence to indicate it was a matter of interest or concern to the community or the public. Appellees filed Craig Hausz's declaration in which he said that the country club had approximately 900 members and that members' spouses and children brought the total club "community" to over 2,000 people. However, the pleadings and other materials in the record show that the decision to reject Fuller's application was made by the club's board—not by its members as a whole. Hausz's declaration says nothing about whether any of the club's other members or their families were interested in the outcome of Fuller's application. Thus, Hausz's declaration does not demonstrate that the "blackball" comment was a matter of interest to the club "community."

The evidence also includes a declaration and an email by club member Shelby Ricketts. In his declaration, Ricketts said that a friend asked him to help Fuller with his application and that he did not agree to sponsor Fuller, but he said nothing about whether any other club members were interested in the outcome of Fuller's application. And in his email, Ricketts explained to someone that he could not be a sponsor for Fuller because he was a friend of the Hauszes and he had learned that Fuller "had some sort of a business issue or disagreement" with the Hauszes. But again, the email does not suggest that Fuller's membership application was of interest to the club's other members or their families. Thus, we conclude that the statement that Fuller was "blackballed" from the club did not involve a matter of public concern.

Our *Vaughn-Riley* opinion supports our conclusion that the "blackball" communication did not involve a matter of public concern. As noted above, the claims in *Vaughn-Riley* were based on comments that actress Vaughn-Riley made about the cancellation of one performance of a play in Tyler, Texas. *See Vaughn-Riley*, 2020 WL 7053651, at *1–2. We held that Vaughn-Riley failed to show that her statements involved a matter of public concern, observing that nothing in the record suggested that the play's cancellation was a subject of general interest or of value and concern to the public. *Id*. at *3–4. Although the people associated with the play's production and the people who had paid to see it were probably concerned about its cancellation, there was no evidence "that the general public, *or even the*

*local Tyler creative community and art patrons at large*[,] were affected by or concerned with the cancellation of this single performance." *Id.* (emphasis added). Similarly, in this case appellees did not demonstrate that the "blackballing" of Fuller's application was a matter of interest to the club's members or their families, much less to the general public. Accordingly, we hold that appellees failed to demonstrate that the alleged statement that Fuller was blackballed was made in connection with a matter of public concern.

### c. Other Arguments

Appellees also argue that their alleged statements concerned a matter of interest to the community because the statements affected club members and other persons in the wider community. Appellees go so far as to contend that appellants' position is that the statements "caused direct, continuing, and apparently irreparable harm to those within a community of thousands, plus those outside the community yet part of its larger network."

We reject these arguments. The record does not demonstrate that the alleged statements affected club members or anyone else (except appellants) in any meaningful way. Even if the statements influenced some country-club board members to vote against Fuller's application or influenced some people who already had relationships with Fuller to distance themselves from him, it does not necessarily follow that the statements were of general interest to the country-club "community" or any other community. Appellees' argument regarding "apparently irreparable

–17–

harm" is also unpersuasive. Appellants alleged that they themselves were suffering irreparable harm as a result of appellees' conduct—not that third parties in the community were suffering such harm.

Appellees filed a post-submission letter brief citing a new case that they contend supports their matter-of-public-concern argument, namely *Hadimani v. Hiremath*, No. 14-22-00002-CV, 2023 WL 3596248 (Tex. App.—Houston [14th Dist.] May 23, 2023, no pet. h.) (mem. op.). In that case, Hadimani was the president of a nationwide nonprofit organization devoted to preserving the religious and cultural identities of Indian-Americans. *Id*. at *1. He sued Hiremath, alleging that Hiremath defamed him by accusing him of misconduct including forgery and criminal fraud. *Id*. at *2–3. Hiremath prevailed on a TCPA motion to dismiss, and Hadimani appealed. *Id*. at *1. The court of appeals held that Hiremath carried his step one burden because his communications were exercises of the right of free speech. *Id*. at *6. Specifically, the court held that the communications related to a matter of public concern because (1) they were of interest to members of the nonprofit "community" and (2) they involved both the management of a nonprofit organization and alleged criminal activity on Hadimani's part. *Id*. We conclude that *Hadimani* is distinguishable for several reasons. First, appellees did not show that their communications about Fuller accused him of criminal activity. Second, appellees did not show that their communications about Fuller had anything to do with the country club's management. And third, appellees did not show that the

–18–

communications made in connection with Fuller's membership application held general interest for the club's members in the way that communications about the club's president would have. Thus, *Hadimani* does not support the premise that appellees' alleged communications were made in connection with a matter of public concern.

### d. Conclusion

On de novo review, and reviewing the pleadings and evidence in the light most favorable to appellants as the nonmovants, we hold that appellees failed to demonstrate that appellants' claims were based on or in response to appellees' exercise of the right of free speech.

### 4. Analysis of the Right of Association

Appellants' public-concern argument also defeats appellees' alternative theory that their alleged communications were exercises of the right of association.

Under the 2019 amendments, the exercise of the right of association means "to join together to collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern." CIV. PRAC. & REM. § 27.001(2). Thus, the public-concern aspect of the right of association differs slightly from that aspect of the right of free speech. A movant who invokes the right of free speech must demonstrate that a communication was made in connection with a matter of public concern. *Id*. § 27.001(3). But a movant who invokes the right of association must demonstrate the existence of "common

interests" that relate to a matter of public concern (or to a governmental proceeding). *Id*. § 27.001(2).

In their TCPA motion, appellees argued that activities related to the country club's membership-application process "are a matter of public concern regarding the community well-being" of the club's members and their immediate families. On appeal, we read appellees' brief to argue that their alleged communications were meant to promote the club members' common interest in admitting only fit and worthy applicants. Appellees argue that this common interest is a matter of public concern because (1) the club is a "community" and so (2) a matter of common interest to the club is a matter of public concern. *See id*. § 27.001(7)(B) (defining "matter of public concern" to include matters of "political, social, or other interest to the community").

We reject appellees' argument because the asserted common interest—the club members' common interest in having only fit and worthy people join the club— does not fit any of the three definitions of "matter of public concern." It does not involve a public official, public figure, or similar person, *see id*. § 27.001(7)(A), and it does not rise to the level of "a subject of concern to the public," *id*. § 27.001(7)(C). The question, then, is whether the asserted common interest is "a matter of political, social, or other interest to the community." *See id*. § 27.001(7)(B). We conclude it is not. A private country club's common interest in screening applicants is not a matter of political or social interest. *See Political*, WEBSTER'S THIRD NEW

–20–

INTERNATIONAL DICTIONARY (defining "political" as "of or relating to government, a government, or the conduct of government affairs"); *Social*, *id*. (defining "social" as "of or relating to human society"); *Society*, *id*. (defining "society" as "a community, nation, or broad grouping of people having common traditions, institutions, and collective activities and interests"). As for the catch-all phrase "other interest," the maxim of ejusdem generis instructs us to limit its meaning to the same kind or class of categories expressly mentioned, i.e., political and social interest. *See City of Houston v. Bates*, 406 S.W.3d 539, 545 (Tex. 2013) (explaining and applying ejusdem generis). Thus, we construe the phrase "other interest" to mean broad public interest akin to the interest raised by political or social issues. *See Chesser v. Aucoin*, No. 01-20-00425-CV, 2020 WL 7391711, at *4 (Tex. App.— Houston [1st Dist.] Dec. 17, 2020, no pet.) (mem. op.) (opining that the 2019 definition of "matter of public concern" more strongly emphasizes the "public" component)

Based on this construction of the TCPA, we conclude that appellees did not demonstrate that this club's common interest in membership decisions relates to a matter of political, social, or other interest to the community. *See Vaughn-Riley*, 2020 WL 7053651, at *3–4 (although the cancellation of a performance of a play affected the people involved in producing the play and the people who held tickets, statements about the cancellation did not involve a matter of public concern for right-of-association purposes); *see also Beard*, 2022 WL 1076176, at *5 (holding that the

–21–

2019 amendments narrowed the meaning of "matter of public concern"). Accordingly, appellees failed to demonstrate that appellants' claims were based on or in response to appellees' exercise of the right of association.

## 5. Conclusion

The trial judge erred by granting appellees' TCPA motion to dismiss and by awarding appellees their attorney's fees. We sustain appellants' first issue on appeal and need not address appellants' remaining issues.

## IV. DISPOSITION

We reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.

/Dennise Garcia/
DENNISE GARCIA
JUSTICE

220893F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MATTHEW FULLER AND
FULLER WEALTH
MANAGEMENT, LLC, Appellants

No. 05-22-00893-CV      V.

CRAIG HAUSZ, MICHELLE
HAUSZ, CMH ADVISORS, PLLC,
AND CMH WEALTH
MANAGEMENT, LLC, Appellees

On Appeal from the 366th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 366-01154-
2022.
Opinion delivered by Justice Garcia.
Justices Pedersen, III and Kennedy
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with the opinion.

It is **ORDERED** that appellants Matthew Fuller and Fuller Wealth Management, LLC recover their costs of this appeal from appellees Craig Hausz, Michelle Hausz, CMH Advisors, PLLC, and CMH Wealth Management, LLC.

Judgment entered this 10th day of August 2023.